1
2
3
4
5
6            UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF WASHINGTON
7
8
9  COMMUNITY ASSOCIATION FOR       )    No. CV-04-3060-LRS
   THE RESTORATION OF THE          )
10 ENVIRONMENT, a Washington       )
   nonprofit corporation,          )    **MEMORANDUM OF**
11                                  )    **DECISION**
                  Plaintiff,        )
12                                  )
   v.                               )
13                                  )
   NELSON FARIA DAIRY, INC.,        )
14                                  )
                                    )
                  Defendant.        )
15                                  )
                                    )
16 ─────────────────────────────   )

17
18        A bench trial was conducted in this matter from November 15 to November

19 17, 2011.  This "Memorandum of Decision" represents the court's findings of fact

20 and conclusions of law pursuant to Fed. R. Civ. P. 52(a)(1) based on the record

21 existing prior to trial, testimony presented at trial, and exhibits admitted at trial.

22
23 **I. BACKGROUND**

24        Smith Brothers Farms, Inc. ("Smith Brothers") owned and operated the

25 dairy facility (the "Dairy") located at 11792 Road 12.5 SW, near Royal City,

26 Washington.

27        On June 7, 2004, Community Association For The Restoration Of The

28 Environment (CARE) filed a complaint against Smith Brothers in the Federal


**MEMORANDUM OF DECISION- 1**

District Court for the Eastern District of Washington, alleging violations of the Clean Water Act (CWA), 33 U.S.C. § 1251 *et seq.*, Comprehensive Environmental Response, Liability, and Compensation Act (CERCLA), 42 U.S.C. § 9601 *et seq.*, and the Emergency Planning and Community Right-to-Know Act (EPCRA), 42 U.S.C. § 11004 *et seq.*  (ECF No. 1).

On March 24, 2006, CARE and Smith Brothers Farms, Inc., entered into a proposed Consent Decree in settlement of CARE's claims.  (ECF No. 39).  The Court approved and entered the Consent Decree on May 23, 2006.  (ECF No. 40).

Defendant Nelson Faria Dairy, LLC ("Faria") purchased the Dairy and its underlying assets from Smith Brothers on October 2, 2006.  (ECF No. 58 at 4).

Beginning on October 2, 2006, Faria became solely responsible for compliance with the Consent Decree.  (ECF No. 40 at ¶¶ 3, 37).

Pursuant to ¶¶ 7-8 of the Consent Decree, on December 15, 2008, CARE provided Faria with notice of its intent to inspect the Dairy on December 17, 2008.

On December 17, 2008, representatives from CARE, including Mike Brown, Gary Christensen, and Rick Carter, inspected the Dairy.

Pursuant to ¶ 9 of the Consent Decree, on December 22, 2008, CARE notified Faria of four conditions which CARE alleged could cause or lead to an imminent discharge of pollutants from the Dairy facility in violation of applicable legal requirements, including the Clean Water Act.  (ECF No. 58 at 6-8).

The issues alleged in CARE's December 22, 2008 letter included: (1) over-application of lagoon waste to the "Hebdon Field" which caused ponding along an area adjacent to the south side of an irrigation canal; (2) significant ponding of manure water in a field just north of the Dairy; (3) applications to a field directly east of the Dairy when the ground was frozen, snow covered, and with no active cropping; (4) application of manure wastes to a field south of the Dairy which had no crop currently growing.  (*See id*.)

On January 30, 2009, CARE provided another letter to Faria alleging ten

**MEMORANDUM OF DECISION- 2**

other violations of the Consent Decree.  (*Id*. at 10-12).

CARE attempted to negotiate a settlement with Faria regarding the alleged Consent Decree violations over the course of the next 18 months.  (Plaintiff's Ex. 72).

On May 17, 2010, CARE filed a Motion for an Order to Show Cause For Failure to Comply with Consent Decree.  (ECF No. 55).  The Court granted CARE's motion on May 18, 2010.  (ECF No. 60).  In doing so, the court extended the Consent Decree indefinitely pending further order.  Accordingly, the Consent Decree remains in effect and has not expired.[1]

CARE's Motion for an Order to Show Cause, (ECF No. 55), alleged numerous instances of non-compliance.  In an order dated January 7, 2011 (ECF No. 123), the court found eight instances of non-compliance.

Faria's non-compliance with the Consent Decree began no later than November 1, 2006, when Faria failed to properly prepare its water balances.  (ECF No. 123 at 3; Ex. 51 at 5 (incorrect water balance for period from October-November, 2006)).

## II.  INSTANCES OF NON-COMPLIANCE PREVIOUSLY FOUND BY COURT

This court previously found eight separate instances of non-compliance by

---

[1]The Consent Decree was  entered on May 23, 2006 (ECF No. 40) and by its terms, was to expire three years from the date of its entry.  (Paragraph 37).  The Consent Decree was extended three separate times by order of the court following joint motions from the parties (ECF Nos. 48, 50 and 54).  The last of these three orders extended the life of the decree to May 25, 2010.

**MEMORANDUM OF DECISION- 3**

Defendant with the Consent Decree.  See January 7, 2011 "Order Re Motion For Order Of Contempt," (ECF No. 123), which is fully incorporated herein.  Pending trial, the court reserved determination of whether those instances of non-compliance constituted contempt.  The court now concludes these instances of non-compliance did not amount to "substantial compliance" with the Consent Decree and therefore, Defendant is in contempt with regard to those eight violations of the Consent Decree.  "Substantial compliance" is a defense to civil contempt and is not vitiated by a "few technical violations" where every reasonable effort has been made to comply.  *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993).  The eight instances of non-compliance recited in the court's January 7, 2011 order do not amount to a "few technical violations" and the Defendant did not make every reasonable effort to comply with the specific terms of this very detailed Consent Decree.

Defendant's alleged "good faith" and lack of willfulness is irrelevant.  "Good faith" does not excuse civil contempt.  *Id.*[2]  Technical or inadvertent violations are not a defense to contempt if the defendant has failed to take all reasonable steps to compliance.  *General Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir. 1986).  The court questions Defendant's good faith in light of Mr. Faria's testimony that he read the very detailed and technical requirements in the 26 page Consent Decree only once after he purchased the dairy and

---

[2]  A good faith and reasonable interpretation of the terms of the Decree is a different matter, *In re Dual Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993), and essentially constitutes "substantial compliance."  Defendant does not assert, nor does the evidence support, that it acted or failed to act pursuant to a good faith and reasonable interpretation of terms of the Decree.

**MEMORANDUM OF DECISION- 4**

furthermore, did not seek the assistance of counsel and/or other professional help to insure he fully understood his obligations and what exactly he needed to do in order to comply with those obligations.  The evidence bears out there was never any reasonable effort by Defendant to comply with the specific terms of the Consent Decree.  Defendant may sincerely believe it improved the Dairy through changes it made and in doing so, complied with the "spirit" of the Consent Decree.  That, however, is not adequate.  Since January 7, 2011, the Defendant has not purged its contempt in any meaningful way with regard to the eight violations of the Consent Decree previously found by the court.

A party may have an equitable defense to a remedy ordered by the court, but the only defense to a violation of a consent decree must be found within the four corners of the decree.  *Cook v. City of Chicago*, 192 F.3d 693, 695 (7th Cir. 1999).  Defendant has not met its burden of establishing any equitable defense to its violations of the Consent Decree.  Mr. Faria at no time gave notice of nor communicated with anyone else associated with CARE, including Cindy Carter, prior to making changes to the Dairy operations.  Mr. Faria's interactions with Carter, which are best be described as no more than casual, do not constitute reasonable reliance on the part of Defendant that it did not have to comply with the very specific terms of the Consent Decree, particularly so when those terms include: 1) that "this Decree may not be modified except by written amendment agreed to by the Parties and approved by the Court;" 2) that counsel for CARE, in addition to Cindy Carter, was to be provided with all notices required under the Decree; and 3) that "CARE shall act as a single legal entity with respect to all notices, decisions, and other actions taken under this Decree," and Defendant "shall not be answerable to individual CARE members in complying with this Decree."  (ECF No. 40 at Paragraphs 34, 38 and 39).  Cindy Carter did not, indeed could not by herself, waive violations of the Consent Decree.  Hence, there was no waiver by CARE and it is not equitably estopped from seeking to hold Defendant

**MEMORANDUM OF DECISION- 5**

1  in contempt for these violations of the Consent Decree.

2      The fact CARE members, pursuant to the terms of the Decree (ECF No. 40

3  at Paragraphs 7-10), did not formally inspect the dairy until December 2008 does

4  not give rise to a laches defense. Defendant cannot claim any prejudice in light of

5  its failure to make any reasonable effort to comply with the Consent Decree from

6  the moment it purchased the dairy.

7

8  **III.  NPDES PERMIT**

9      In its January 7, 2011 order, the court reserved determination of whether

10  Defendant's failure to have a NPDES permit constituted a violation of the Consent

11  Decree.

12      Paragraph 5 of the Consent Decree states that "[i]n operating the Dairy, the

13  Defendants shall abide by CERCLA, EPCRA, CWA, and **any applicable**

14  Washington National Pollution Discharge Elimination System ("NPDES") permit

15  and the Dairy's nutrient waste management plan." (Emphasis added).  The plain

16  language- "any applicable permit" -suggests there may be no applicable permit.

17      Washington courts apply the "context rule" which permits a court to look to

18  extrinsic evidence to discern the meaning or intent of words or terms used by

19  contracting parties, even when the parties' words appear to be clear and

20  unambiguous. *Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 695, 974 P.2d 836 (1999).

21  Extrinsic evidence includes the subject matter and objective of the contract, all the

22  circumstances surrounding the making of the contract, the subsequent acts and

23  conduct of the parties, and the reasonableness of the respective interpretations

24  urged by the parties. *Hearst Communications, Inc v. Seattle Times Co.*, 154

25  Wn.2d 493, 502, 115 P.3d 262 (2005).  Extrinsic evidence may not, however, be

26  used to "'show an intention independent of the instrument' or to 'vary, contradict

27  or modify the written word.'" *Id*. at 503, quoting *Hollis*, 137 Wn.2d at 695-96.

28  Moreover, extrinsic evidence of a party's subjective, unilateral intent as to the

**MEMORANDUM OF DECISION- 6**

1    contract's meaning is not admissible. *Id*.   Nor is it admissible under the parol

2    evidence rule to add to the terms of a fully integrated written contract. *Brogan &*

3    *Anensen, LLC  v. Lamphiear*, 165 Wn. 2d 773, 775, 202 P.3d 960 (2009).

4        Based on the extrinsic evidence presented at trial, the court concludes the

5    mutual intent of the parties who entered into the Consent Decree (Smith Brothers

6    and CARE) was that the term "any applicable permit" referred to a general permit

7    or to an individual NPDES permit.  These parties did not intend there might be no

8    applicable permit at all.  At the time the Consent Decree was filed (May 23, 2006),

9    Smith Brothers was operating under a general NPDES permit and expressed its

10   intention to continue to operate under such a permit through the period of the

11   Consent Decree.    In a March 2005 letter from counsel for Smith Brothers to the

12   Plaintiff, counsel for Smith Brothers urged the term of the Consent Decree be

13   limited to three years in consideration of the fact "the Dairy will be under the State

14   of Washington's new CAFO (Concentrated Animal Feeding Operation) permit

15   which is much more restrictive than the General Permit for Dairy Operations" and

16   that "[t]hese and other applicable regulatory requirements will extend beyond the

17   term of the consent decree."  (Plaintiff's Ex. 62 at p. 30).  In the same letter,

18   counsel for Smith Brothers indicated the dairy "will soon be subject to the State of

19   Washington's CAFO NPDES and Waste Discharge General Permit" and that "the

20   Dairy's overall nutrient-management program will incorporate the combined

21   groundwater protection requirements of the settlement, the Nutrient Management

22   Plan, and the CAFO permit."  (*Id*. at 22).  The testimony at trial of Scott Highland,

23   president of Smith Brothers, corroborated it was Smith Brothers' understanding

24   that pursuant to the Consent Decree, it would need to have a NPDES permit.

25        The objective of the Consent Decree establishes that having a NPDES

26   permit was a requirement of the Decree.  The primary focus of CARE's lawsuit

27   against Smith Brothers was to obtain compliance with the Clean Water Act.

28   CARE made clear in correspondence with Smith Brothers that obtaining a NPDES

**MEMORANDUM OF DECISION- 7**

1   permit was "of course, also a necessary component[]" of any acceptable
2   settlement.  (ECF No. 78 at 4).  CARE stated that its settlement proposal was
3   "generally intended to help assess and ensure future compliance with the Clean
4   Water Act." (*Id*. at 11).  In a later letter to Smith Brothers, CARE insisted that
5   some sort of Clean Water Act penalties be paid since the "facility has been
6   operating without the required NPDES permit since the operations started." (*Id*. at
7   15).

8        The fact Mr. Faria was not involved in the negotiations regarding the
9   Consent Decree and was not an original party to the Decree is of no significance.
10  See *Newport Yacht Club v. City of Bellevue*, 2010 WL 1286860 at *4 (W.D. Wash.
11  2010)("More importantly, Helland was not a party to the contract, making her
12  interpretation of the Settlement Agreement- even if contradictory- irrelevant").  It
13  is the mutual intent of CARE and Smith Brothers which is of significance.  Were it
14  otherwise, the successor or assign of a Consent Decree could easily circumvent the
15  mutual intent of the parties to the Consent Decree.  Furthermore, it bears noting
16  that there is evidence in the record indicating Faria Dairy was aware that a NPDES
17  permit was required.  In November 2008,  Faria Dairy sold off ½ of its assets to
18  Allred Brothers, LLC.  The "Agreement For Purchase And Sale Of Real Property,
19  And Livestock, Bill Of Sale And Escrow Instructions," (Plaintiff's Ex. 63 at
20  00560), contains a provision, Paragraph 13(b), stating the buyer acknowledged
21  reviewing "the Application for and Final Order for Concentrated Animal Feeding
22  Operations NPDES" and the "State Waste Discharge General Permit applications."
23  It is also noted that Mr. Faria maintains an ownership interest in at least six other
24  dairies, five located in Texas and one in New Mexico.  Some of these dairies have
25  CAFO NPDES permits and are subject to regulatory controls similar to those in
26  Washington.

27        Based on the aforementioned extrinsic evidence, a reasonable interpretation
28  of the Consent Decree is that Paragraph 5 required Smith Brothers Dairy and its

**MEMORANDUM OF DECISION- 8**

successor, Faria Dairy, to "abide by" (operate), and therefore necessarily have, a NPDES Permit.  Extrinsic evidence is not used here to show an intention independent of the Decree or to "vary, contradict or modify the written word." The court does not rely on extrinsic evidence of any party's subjective, unilateral intent and its interpretation does not add to the terms of the "fully integrated" Decree.  (See ECF No. 40 at Paragraph 34).

Since it purchased the dairy, Defendant has not operated the Dairy under a NPDES permit.  It has not complied or "substantially complied" with Paragraph 5 of the Consent Decree and it has no equitable defenses to compliance.  Because Paragraph 5 of the Consent Decree was sufficiently clear by an objective standard which takes into account the context in which it was issued[3], it is appropriate to find the Defendant in contempt for not obtaining a NPDES permit.  Defendant has not offered a good faith and reasonable interpretation of Paragraph 5 so as to justify its failure to procure a NPDES permit.

## IV.  OTHER ALLEGED INSTANCES OF NON-COMPLIANCE WITH DECREE

### A.  APPLICATIONS TO "NORTH FIELD"

Faria owns the land identified as the "North Field," which encompasses all of Unit 10, Block 83.  Ex. 11.  This land is located just north of the Dairy.

From November 18, 2008 to December 11, 2008, Faria applied 2,142,000 gallons of liquid manure to the North Field.  Ex. 26.  The application was conducted by Northwest Liquid Transport, Inc.  *Id.*

An additional 74,000 gallons of liquid manure was applied to the North Field between November 18, 2008 and December 21, 2008.  Ex. 28.

Between November, 2007 and March, 2009, a total of 7,287,400 gallons of liquid manure was applied to the North Field.  *Id.*

---

[3] See *United States v. Young*, 107 F.3d 903, 908 (D.C. Cir. 1997).

**MEMORANDUM OF DECISION- 9**

Sometime during the November-December 2008 manure applications, a ponded area formed along the north side of the North Field.  Gary Christensen, CARE member, photographed the ponded area in an aerial fly-over in December 2008.  Ex. 24.

Immediately north and adjacent to the ponded area is an irrigation canal.  *Id*. The ponded area froze over the during the winter of 2008-2009.

On February 25, 2009, Cascade Analytical, Inc., a certified environmental laboratory, took water quality samples from the then-thawed ponded area.  Ex. 25.

The results of those water quality samples indicated that the liquid contained in the ponded area was contaminated with manure.  *Id*.

In March 2009, Faria removed 272,000 gallons of the ponded liquid manure using a 4,000-gallon "Honey Vac."  Ex. 29.  The manure was removed from an area described as "Ponded water at North-East corner of field."  *Id*.  The manure was then reapplied to a field.  *Id*.  David Rollema, who prepared the "Honey Vac Cleanup Applications" document, indicated that the field on which the ponded water was removed was Unit 10, Block 83 (the North Field), and not Unit 14, Block 83, as reported on the application report.

Ponded water was observed in the North Field up to June 5, 2009. Para. 5 of the Consent Decree requires Faria to abide by its Dairy Nutrient Management Plan ("NMP").  Faria's NMP prohibits the application of liquid manure under conditions that allow contaminated waters to run off fields and into surface waters, or to be allowed to infiltrate to ground water.  Ex. 2, p. 22, 25; Ex. 3, p. 21, 25.  The NMP also prohibits the application of manure if there is a potential for ponding.  *Id*.

The ponding of manure water in the North Field caused, or threatened to cause, a discharge of pollutants into surface waters and/or ground water.

The ponding of manure water in the North Field between November, 2008 and June, 2009 was a violation of Faria's NMP and Para. 5 of the Consent Decree.

**MEMORANDUM OF DECISION- 10**

**B.  APPLICATIONS TO "HEBDON FIELD"**

Faria has installed and maintains a series of underground pipes for the transport of liquid manure from its lagoons to off-site fields.  The pumping and control mechanism for determining whether, and how much, manure is transported through these pipes is located at the Dairy.

One of the fields that receives liquid manure from Faria's underground pipes is known as the "Hebdon Field."

Sometime in late November or early December 2008, Faria began applying manure water through its underground pipes to the Hebdon Field.

The pipeline leaked twice onto the Hebdon field during this time frame.

During the course of that application, excess manure was applied to the Hebdon Field, in part as the result of two separate leaks in the piping apparatus.

The leaked manure water caused a ponded area to form on the north side of the Hebdon Field.  Gary Christensen, CARE member, photographed the ponded area in an aerial fly-over in late November, 2008.  Ex. 30.  Immediately north and adjacent to the ponded area is an irrigation canal.  *Id*.

On February 25, 2009, Cascade Analytical conducted soil sampling on the Hebdon Field.  The results of this sampling revealed excessively high levels of nitrate and phosphorus.  Ex. 31 at 11-20.

These excessively high levels of nitrate and phosphorus are consistent with over-applications of manure to the Hebdon Field.

Para. 5 of the Consent Decree requires Faria to abide by its NMP.  ECF No. 40 at 3.  Faria's NMP prohibits the application of liquid manure under conditions that allow contaminated waters to run off fields and into surface waters, or to be allowed to infiltrate to ground water.  Ex. 2, p. 22, 25; Ex. 3, p. 21, 25.  The NMP also prohibits the application of manure if there is a potential for ponding.  *Id*.  The NMP further prohibits application of manure unless post-harvest soil test results justify a need for nutrients, or at rates higher than the planned crop will use

**MEMORANDUM OF DECISION- 11**

1  during the season. *Id*.

2      The ponding of manure water in the Hebdon Field caused, or threatened to

3  cause, a discharge of pollutants into surface waters and/or ground water.

4      The over-application of manure to the Hebdon Field caused, or threatened to

5  cause, a discharge of pollutants to ground water.

6      The ponding of manure water in the Hebdon Field between November and

7  December, 2008, was a violation of Faria's NMP and Para. 5 of the Consent

8  Decree.

9      Faria's over-application of manure to the Hebdon Field, as evidenced by

10 elevated nitrate and phosphorus levels, was a violation of Faria's NMP and Para. 5

11 of the Consent Decree.

12

13 **C.  APPLICATIONS TO "DYKES FIELD"**

14     The "Dykes Field" is a field to which Faria has applied manure.  It is located

15 east of the Dairy and is identified as Unit 6, Block 83.

16     Sometime between November 18 and December 11, 2008, Faria applied

17 3,892,000 gallons of liquid manure to the Dykes Field.  Ex. 26.

18     These applications occurred when the ground was frozen and/or snow

19 covered, as depicted by CARE member Gary Christensen's photograph of the

20 Dykes Field.  Ex. 32.

21     At the time of the applications, there was no active cropping on the Dykes

22 Field.  *Id*.

23     Subsequent soil sampling conducted by Cascade Analytical on February 25,

24 2009 revealed excessively high levels of nitrates and phosphorus in the Dykes

25 Field.  Ex. 31, pp. 1-8.

26     These excessively high levels of nitrate and phosphorus are consistent with

27 over-applications of manure to the Dykes Field.

28     Para. 5 of the Consent Decree requires Faria to abide by its NMP.  ECF No.

**MEMORANDUM OF DECISION- 12**

40 at 3. Faria's NMP prohibits the application of liquid manure under conditions that allow contaminated waters to run off fields and into surface waters, or to be allowed to infiltrate to ground water. Ex. 2, p. 22, 25; Ex. 3, p. 21, 25. The NMP also prohibits the applications of manure to bare ground or when the ground is frozen, saturated, or snow covered. *Id.* The NMP further prohibits application of manure unless post-harvest soil test results justify a need for nutrients, or at rates higher than the planned crop will use during the season. *Id.*

The over-application of manure to the Dykes Field caused, or threatened to cause, a discharge of pollutants to ground water.

The application of manure to the Dykes Field when there was no active cropping and when the ground was frozen and snow covered caused, or threatened to cause, of discharge of pollutants to ground water.

Faria's application of manure to the Dykes Field while the ground was frozen, snow-covered, and without active cropping was a violation of Faria's NMP and Para. 5 of the Consent Decree.

Faria's over-application of manure to the Dykes Field, as evidenced by elevated nitrate and phosphorus levels, was a violation of Faria's NMP and Para. 5 of the Consent Decree.

### D.  MANURE ON ROADWAY

Faria uses trucks to haul liquid and solid manure off-site for application to nearby fields. Some of these trucks receive manure from Faria's storage lagoons via a pumping mechanism, which transports liquid manure to the truck loading station.

There have been instances of liquid manure being spilled by Faria's trucks onto public roadways since June 15, 2009. Exs. 37, 38. Several of these spills have been photographed by CARE members. Ex. 35.

Para. 5 of the Consent Decree requires Faria to abide by its NMP. ECF No.

**MEMORANDUM OF DECISION- 13**

40 at 3.  Faria's NMP instructs that Dairy staff shall inspect and clean all vehicles that come in contact with manure.  Ex. 2 at 36; Ex. 3 at 33.

The inspection and cleaning of vehicles that come in contact with manure helps fulfill one of the primary objectives of the NMP, which is to prevent wastewater discharges to streams, drainage ditches, and the underlying aquifer. Ex. 2 at 6; Ex. 3 at 4.

The presence of manure on public roadways caused, or threatened to cause, a discharge of pollutants into surface water and/or ground water, including drainage ditches located adjacent to the roadways on which Faria's trucks travel. Ex. 48, p. 21.

Faria's past failure to inspect and clean manure-laden vehicles leaving the Dairy property was a violation of Faria's NMP and Para. 5 of the Consent Decree.

## E.  FAILURE TO DREDGE LAGOON PURSUANT TO BEST MANAGEMENT PRACTICES

Para. 13(d) of the Consent Decree requires Faria to periodically dredge its storage lagoon consistent with best management practices.  ECF No. 40 at 7. Faria's NMP requires the Dairy to maintain the storage capacity of both its lagoons by regularly cleaning and agitating the lagoons to remove solid deposits. Ex. 2 at 29; Ex. 3 at 24.  Faria is required to abide by its NMP pursuant to the Consent Decree.  ECF No. 40 at 3.

Faria did not dredge its lagoons in 2007 and 2008.  ECF No. 67, ¶11.  This significantly reduced the storage capacity of the lagoons, as a substantial amount of sediment and solids were allowed to build up over that time frame.

Faria's failure to clean and agitate both lagoons, and to periodically dredge the storage lagoon in accordance with best management practices, increases the possibility of a release of manure from the lagoons during a significant precipitation event.

**MEMORANDUM OF DECISION- 14**

Faria's failure to clean or agitate its lagoons and to periodically dredge the storage lagoon during 2007 and 2008 was a violation of Faria's NMP and Paras. 5 and 13(d) of the Consent Decree, which required Faria to abide by its NMP and maintain its lagoons in accordance with best management practices.

## F.  TEARS IN LAGOON LINERS

Faria's storage and treatment lagoons are lined with a synthetic PVC plastic liner.  This liner is intended to help prevent liquid manure from seeping into the ground and, potentially, infiltrating the groundwater.

When the lagoons were first constructed, prior to the installation of the lagoon liners, water was seen seeping into the lagoons.  Ex. 47.  The Washington Department of Ecology noted, in a 2001 letter to Smith Brothers, that the water seepage possibly originated from the nearby irrigation canal, which borders the northern part of Faria's property.  *Id.*

A number of tears in the storage lagoon liner were discovered during one of CARE's inspections of the Dairy facility.  CARE photographed these tears and warned Faria of the dangers they could pose if manure water was allowed to infiltrate the local groundwater.  Ex. 33.

Faria discovered these tears as early as February, 2009.  Ex. 34 at 4.  Mr. Rollema, who was later put in charge of Faria's manure management practices, first noticed the tears after the 2009 fall "draw-down" of the lagoons.  Repairs were not made to the tears until after the spring 2010 draw-down.

Para. 5 of the Consent Decree requires Faria to abide by its NMP.  ECF 40 at 3.  One of the primary objectives of the NMP is to prevent migration of contaminants from the dairy facility to the underlying aquifer.  Ex. 2 at 6; Ex. 3 at 4.  To accomplish this objective, the NMP instructs Faria to "maintain and repair any damage to [the] PVC liner *as it occurs* to prevent ground water contamination."  Ex. 2 at 19; Ex. 3 at 14 (emphasis added).

**MEMORANDUM OF DECISION- 15**

Faria's failure to repair lagoon liner tears as they occurred was a violation of Faria's NMP and Para. 5 of the Consent Decree.

## G.  GROUNDWATER CONTAMINATION

Nitrogen, one of the substances of concern found in manure, is highly mobile.  It can readily convert to nitrate and leach through the unsaturated (or vadose) zone of soils and into the local aquifer.  For this reason, it is imperative that liquid manure is applied to fields only in amounts that the current crop can completely utilize.

Once nitrates leach below the root zone of crops, it is destined to reach groundwater, unless conditions suitable to denitrification exist.  Denitrification is the process whereby nitrate is converted to harmless nitrogen gas.  It can only occur in poorly drained soils or organic soils where oxygen is depleted in the root zone.

The major soil type near the Faria Dairy is identified as Kennewick loamy fine sands.  Ex. 3 at 18.  Such soils are well drained, *Id*. at App. B, and are therefore not conducive to the denitrification process.  This means that excess nitrates are rapidly transported through the soil and into local groundwater.

Between December 1 and December 3, 2010, CARE installed three environmental groundwater monitoring wells along the northern border of Faria's property and one reference well nearby.  Ex. 9 (installation logs); Ex. 13 at 2 (map of well locations; environmental monitoring wells identified as A, B, C, & D; wells E and F are pre-existing domestic wells).  Delos Boyce, a Washington-licensed driller, installed the wells in consultation with CARE's groundwater expert, Dr. Byron Shaw.  Ex. 12.

To date, Cascade Analytical has conducted three rounds of water quality sampling from the wells.  *See* Exs. 18-20.

The first sampling occurred on December 7, 2010.  Ex. 18.  The results of

**MEMORANDUM OF DECISION- 16**

that sampling event revealed nitrate concentrations in all four wells that were in excess of the 10 mg/L maximum contaminant level established by the EPA (U.S. Environmental Protection Agency). *Id*.

The second round of sampling occurred on January 3, 2011. Ex. 19. The results of that sampling event revealed nitrate concentrations in all four wells that were in excess of the 10 mg/L maximum contaminant level established by the EPA. *Id*.

The third round of sampling occurred on July 27, 2011. Ex. 20. The results of that sampling event revealed lower nitrate concentrations in wells A, B, and C. *Id*. Well D still had nitrate concentrations in excess of the 10 mg/L maximum contaminant level. *Id*.

The lower nitrate levels observed in Wells A, B, and C during the July, 2011 sampling event are the result of dilution from seepage from the irrigation canal located immediately adjacent to the wells. All three wells had a significantly higher water level than in the previous two sampling events. Ex. 20. Furthermore, water quality samples taken from the irrigation canal directly upstream and downstream of the monitoring wells show that the water in the canal is chemically similar to that contained in the wells. *Id*.

Data from these three sampling events and related information indicates that groundwater flows down and away from the Dairy in a north-northwesterly direction, toward CARE's environmental monitoring wells and nearby residences and farms.

Faria's manure management practices are the predominant source of the nitrate contamination found in the monitoring wells and, correspondingly, local groundwater. These practices include consistent over-application of manure to fields located adjacent to, and nearby, the Dairy.

Under the Washington General CAFO NPDES permit, dairies are prohibited from applying agricultural wastes if such applications will cause or contribute to a

**MEMORANDUM OF DECISION- 17**

violation of the State Ground Water Quality Standards, Chapter 173-200 Washington Administrative Code ("WAC").

Pursuant to WAC 173-200-040 (Table 1), the ground water quality standard for nitrate is 10 milligrams per liter (mg/L).

Faria's manure management practices have caused or significantly contributed to the excessive nitrate contamination of the local groundwater, as observed and documented by CARE's monitoring wells.

## V. REMEDIES

"A consent decree is no more than a settlement that contains an injunction." *In re Masters Mates & Pilots Pension Plan and IRAP Litigation*, 957 F.2d 1020, 1025 (2nd Cir. 1992). As such, it is subject to modification like any injunction. A court retains continuing jurisdiction to modify an injunction. This well-recognized principle is codified in Fed. R. Civ. P. 60(b)(5) which provides that a court may relieve a party from a final judgment or order if "it is no longer equitable that the judgment should have prospective application." "The continuing responsibility of the issuing court over its decrees is a necessary concomitant of the prospective operation of equitable relief and has its roots in the historic power of chancery to modify or vacate its decrees 'as events may shape the need.'" Wright, Miller & Kane, *Federal Practice and Procedure*, Civil 2d §2961 at 392 (2nd Ed. 1995), quoting *U.S. v. Swift & Co.*, 286 U.S. 106, 114, 52 S.Ct. 460 (1932). Accordingly, "wide discretion" resides with the district court when it considers modification of a decree. *System Fed'n No. 91, Ry. Employees' Dept., AFL-CIO v. Wright*, 364 U.S. 642, 648, 81 S.Ct. 368 (1961). See also *Earth Island Institute, Inc. v. Southern California Edison*, 166 F.Supp.2d 1304, 1309 (S.D. Cal. 2001) (broad "power to modify the Consent Decree derives from principles of equity and exists independent from any express authorization within the Decree or the parties' request). "Inasmuch as an injunctive decree is drafted in

**MEMORANDUM OF DECISION- 18**

1  light of what the court believes will be the future course of events, a court must be

2  continually willing to redraft the order at the request of the party who obtained

3  equitable relief in order to insure that the decree accomplishes its intended result."

4  Wright, Miller & Kane, *Federal Practice and Procedure*, Civil 2d §2961 at 393

5  (2nd Ed. 1995). Consistent therewith, the Supreme Court has articulated

6  requirements for modification of a consent decree as follows: (1) "a significant

7  change in facts or law warrants revision;" and (2) "the proposed modification is

8  suitably tailored to the changed circumstance." *Rufo v. Inmates of Suffolk County*

9  *Jail*, 502 U.S. 367, 393, 112 S.Ct. 749 (1992).

10       Here, because of Defendant's failure to comply with the Consent Decree

11  from the very outset of its operation of the dairy, the Decree has not accomplished

12  "its intended result." Accordingly, modification is warranted. The failure of the

13  Defendant to comply with the Consent Decree constitutes a significant change of

14  circumstances which justifies a temporal extension of the Decree.

15  *Labor/Community Strategy Center v. Los Angeles County Metropolitan*

16  *Transportation Authority*, 564 F.3d 1115, 1120-21 (9th Cir. 2009). Defendant's

17  non-compliance with the decree is not *de minimis*, but rather amounts to the "near

18  total," if not total, non-compliance which other courts have concluded warrants

19  extension of a consent decree. *Id*. at 1123. The court will therefore extend the

20  Decree for a period of three (3) years from the date of the forthcoming "Order On

21  Relief." Defendant's non-compliance also warrants certain non-temporal

22  revisions to the Decree which will be set forth in detail in the forthcoming "Order

23  On Relief." All of these revisions are remedial in nature, not punitive. They

24  better achieve the purpose of the original Consent Decree and in doing so, serve

25  the public interest. *Earth Island Institute*, 166 F.Supp.2d at 1309-1310. The

26  revisions are suitably tailored to the changed circumstances in that they insure

27  greater accountability and better oversight of Defendant.

28       An award of attorney's fees and costs for civil contempt is within the

**MEMORANDUM OF DECISION- 19**

discretion of the court. *Harcourt Brace v. Multistate Legal Studies*, 26 F.3d 948, 953 (9th Cir. 1994). A finding of willfulness is not required. *Perry v. O'Donnell*, 759 F.2d 702, 705 (9th Cir. 1985). An award of fees and costs is independent of an award of compensatory damages. *Id*. As set forth in the forthcoming "Order On Relief," the court is awarding Plaintiff its reasonable past attorney fees and costs incurred in this matter. The court, however, declines to obligate Defendant to pay reasonable future attorney fees and costs incurred by Plaintiff. Therefore, Paragraph 70 of Plaintiff's "Proposed Order On Relief" (ECF No. 179) will be omitted.

The court also declines to include Paragraph 71 of the "Proposed Order On Relief" pertaining to "Contempt Payments." This provision appears to assume that any violation of the "Order On Relief" will constitute contempt. The forthcoming "Order On Relief" incorporates the proposed provisions concerning "Dispute Resolution" (Paragraphs 72 and 73 in the "Proposed Order On Relief"). If Plaintiff believes the Defendant is in contempt, it will need to file a Motion For Contempt, in addition to or in lieu of a "petition for judicial resolution of the dispute" provided for in the forthcoming "Order On Relief". This insures that Plaintiff is held to its continuing burden to prove any contempt by clear and convincing evidence. *Federal Trade Comm'n v. Affordable Media, LLC*, 179 F.3d 1228, 1239 (9th Cir. 1999).

**IT IS SO ORDERED.** The District Court Executive is directed to enter this Memorandum Of Decision and provide copies of the same to counsel of record. Judgment will be entered at the time the "Order On Relief" is filed.

**DATED** this _____30th_____ day of December, 2011.

*s/Lonny R. Suko*
_____
LONNY R. SUKO
United States District Judge

**MEMORANDUM OF DECISION- 20**